## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHESTNUT HILL BENEVOLENT ASSOCIATION,** *et al.*, **Plaintiffs,** v. **SYLVIA MATHEWS BURWELL, in her official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,** **Defendant.** | **Civil Action No.  14-2135 (JEB)** |

## <u>MEMORANDUM OPINION</u>

The federal Medicare program reimburses religious nonmedical healthcare institutions (RNHCIs) for the provision of specific types of nonmedical care to certain religious patients.  In addition, reimbursement is available for the RNHCIs' nurse-training programs if such programs satisfy articulated criteria.  The four Plaintiffs here – all Christian Science nursing facilities – desire reimbursement for running multi-year nurse-training programs.  They bring suit seeking to undo two decisions by the Administrator for the Centers for Medicare and Medicaid Services (CMS) that concluded Plaintiffs were not entitled to such reimbursements because they failed to meet certain regulatory criteria.  Both sides have now moved for summary judgment.  As the Court ultimately agrees that Plaintiffs' programs were not sufficiently accredited, it will affirm CMS's decision and enter judgment in Defendant's favor.

I.      **Background**

A.  The Medicare Statutory and Regulatory Framework

Now nearly 50 years old, the Medicare statute is something of a palimpsest: Congress

erases old terms to make room for new ones, but vestiges remain.  A little history, then, goes a

long way in making intelligible certain statutory and regulatory language that, at first blush,

seems mired in impenetrable bureaucratese.

1.  *Religious Nonmedical Healthcare Institutions*

Medicare was enacted by Congress in 1965 to provide federally funded health insurance

for the aged and disabled.  See 42 U.S.C. § 1395 *et seq*.; id. § 1395c.  At issue in this dispute is

Medicare Part A, which authorizes the government – *i.e.*, CMS – to reimburse certain

institutions, like hospitals and skilled nursing facilities, for providing inpatient and similar types

of care.  See id. § 1395d.  (The Court uses CMS to refer to both that entity and its pre-2001

predecessor, the Health Care Financing Administration.)  The institutions providing such care are

known as "provider[s] of services" or "providers" under the statute, see id. § 1395x(u), which

terms broadly encompass hospitals, skilled nursing facilities, and, as of 1997, RNHCIs.  See id.

§ 1395x(y)(1).  The last are inpatient institutions that "provide[] only nonmedical nursing items

and services exclusively to patients who choose to rely solely upon a religious method of healing

and for whom the acceptance of medical health services would be inconsistent with their

religious beliefs."  Id. § 1395x(ss)(1)(C).

Although the term RNHCI first appeared in 1997, the statute had since its inception

provided an express accommodation for members of the First Church of Christ, Scientist (or

"Mother Church") – who object to receiving medical care – by allowing Christian Scientists, in

lieu of receiving inpatient medical care from hospitals, to receive reimbursable nonmedical care

from a "Christian Science sanatorium operated, or listed and certified, by the [Mother Church]."

Pub. L. No. 89-97 §§ 1861(e), (y), 79 Stat. 286, 315, 324 (1965).  That provision remained in

effect until 1996, when a federal district court held that the statute's exemptions, expressed as

they were in "sect-specific" terms, "'cross[ed] the line from permissible accommodation to

impermissible establishment'" of religion in violation of the First Amendment's Establishment

Clause.  Children's Healthcare is a Legal Duty, Inc. v. Vladeck, 938 F. Supp. 1466, 1485 (D.

Minn. 1996) (quoting Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 710

(1994)).  This precipitated Congress's amendment of the Medicare statute in 1997 to excise all

Christian Science-specific references and replace them with references to RNHCI – Congress's

sect-neutral neologism.  See Balanced Budget Act of 1997, Pub. L. No. 105-33 § 4454, 111 Stat.

251 (1997) (codified at 42 U.S.C. § 1395x(ss)).  All of this notwithstanding, it appears that the

only Medicare-certified RNHCIs – of which there were only 17 during the relevant period – are

Christian Science facilities.  See Administrative Record II (A.R.II) at 4 n.4 (Second CMS

Decision).

### 2. *Reimbursement for Approved Educational Activities*

In order to receive Medicare reimbursement, RNHCIs must establish an agreement with

the Secretary of Health and Human Services, comply with that agreement, and abide by all

relevant Medicare statutes and regulations.  See 42 U.S.C. §§ 1395cc(a)(1), (b)(2).  In addition to

offering reimbursement for inpatient care, the statute's implementing regulations have, since

1966, allowed providers to get reimbursed for running "approved educational activities" that

"contribute to the quality of patient care" rendered by that provider.  See 31 Fed. Reg. 14808,

14814 (Nov. 22, 1966) (promulgating 42 C.F.R. § 405.421), redesignated as 42 C.F.R. § 413.85

(1986).  In the 1966 regulations, the Secretary of the Department of Health, Education, and

Welfare (now HHS) recognized that demand for nurses, doctors, and other paramedical

specialties outpaced supply, and so many medical facilities provided training in those specialties

to help close the gap.  See 31 Fed. Reg. at 14814 (concluding that such training was often

"necessary to meet the community's needs for medical and paramedical personnel") (interpreting

House and Senate committee reports accompanying the 1965 Medicare Act, e.g., S. Rep. No. 89-

404, at 36 (1965); H.R. Rep. No. 89-213, at 32 (1965)).  Although the Secretary recognized that

"the costs of such educational activities should be borne by the community," it was clear that

> many communities have not assumed responsibility for financing
> these programs and it is necessary that support be provided by those
> purchasing health care.  Until communities undertake to bear these
> costs, [Medicare] will participate appropriately in the support of
> these activities.

Id. (emphasis added).  For this reason, the government committed to "share in the support of

educational activities customarily or traditionally carried on by providers in conjunction with

their operations," but clarified that it was not the Secretary's intent that educational institutions

already running such programs should shift those costs to providers as a way of obtaining

Medicare reimbursement.  See id.; Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 515 (1994).

At the time, these educational costs – like all other costs associated with inpatient

treatment – were reimbursed under "reasonable cost" principles, meaning the provider would

receive payments for any "cost[s] actually incurred," less expenditures "found to be unnecessary

in the efficient delivery of needed health services."  42 U.S.C. § 1395x(v)(1)(A); see id.

§ 1395f(b).  The "reasonable cost" reimbursement regime was straightforward, but it created

perverse incentives for providers: "The more they spent, the more they were reimbursed."

Tucson Med. Ctr. v. Sullivan, 947 F.2d 971, 974 (D.C. Cir. 1991).

To address the problem, Congress substantially revised the regime in 1982 and 1983.  For most providers, Congress devised the "Prospective Payment System," under which hospitals would receive reimbursement on a per-discharge basis according to a predetermined, fixed sum.  See Social Security Amendments of 1983, Pub. L. No. 98-21, § 601(e), 97 Stat. 65, 152-62 (1983); 42 U.S.C. § 1395ww(d).  For a smaller subset of providers, including the forerunners of RNHCIs, Congress continued to use "reasonable cost" principles, but fixed the rate at which those providers' inpatient costs could increase.  See Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 101, 96 Stat. 324, 331-36 (1982); 42 U.S.C. § 1396x(v).  These enactments made clear, however, that neither of the two cost limits would apply to "approved educational activities" – a phrase that, prior to 1983, had appeared only in regulations and not in the statute itself.  See 42 U.S.C. § 1395ww(a)(4).  Although Congress did not define "approved educational activities," it made clear that such costs were to "pass through" the cost-ceiling regime, allowing providers to obtain reimbursement under the original "reasonable cost" principles.  See Cmty. Care Found. v. Thompson, 318 F.3d 219, 222 (D.C. Cir. 2003) (citing 42 U.S.C. § 1395ww(a)(4), (d)).  Any educational costs that did not constitute "approved" activities, in contrast, were to be treated as "normal operating costs," see 49 Fed. Reg. 234, 267 (Jan. 3, 1984), meaning they were subject to the cost ceilings imposed by the 1982 and 1983 statutory changes.

Given the congressional silence on the meaning of "approved educational activities," Baptist Health v. Thompson, 458 F.3d 768, 771 (8th Cir. 2006), the Secretary took care to define the phrase, identifying by regulation those education-related costs that would receive pass-through treatment and those that would not.  See 42 U.S.C. § 1395hh (granting broad rulemaking authority); see generally id. § 1395f (specifying the Secretary's powers to make rules governing

conditions and limitations on reimbursements).  From 1982 to 2001, the only activities that were

eligible for pass-through treatment were education programs that: (1) graduated personnel in

recognized specialties, and (2) were "approved" or accredited by a predetermined "approving

bod[y]."  See, e.g., 42 C.F.R. § 405.421(e) (1983).  As of 2001, however – and critical to the

dispute at hand – CMS has defined "approved educational activities" as "formally organized or

planned programs of study of the type that: (1) Are operated by providers . . . ; (2) Enhance the

quality of health care at the provider; and (3) Meet the requirements of paragraph (e) of this

section for State licensure or accreditation."  42 C.F.R. § 413.85(c).  Paragraph (e), in turn,

elaborates that the government "will consider an activity an approved nursing . . . education

program if"

> the program is a planned program of study that is licensed by State
> law, or if licensing is not required, is accredited by the recognized
> national professional organization for the particular activity.  Such
> national accrediting bodies include, but are not limited to, the
> Commission on Accreditation of Allied Health Education Programs,
> the National League of Nursing Accrediting Commission, the
> Association for Clinical Pastoral Education Inc., and the American
> Dietetic Association.

Id. § 413.85(e) (emphasis added).

In addition, since the 1982 and 1983 statutory changes, the government has distinguished

between less-formal trainings like "orientation" and "on-the-job training," which are not eligible

for pass-through treatment, and more formal, typically degree-conferring programs, which are.

See, e.g., 42 C.F.R. §§ 405.421(d), (c), (e) (1983); 68 Fed. Reg. 45346, 45424 (Aug. 1, 2003).

As to the latter, only "programs that enable an individual to be employed in a capacity that he or

she could not have been employed [in] without having first completed a particular education

program" were eligible.  See 68 Fed. Reg. at 45428 (emphasis added).

6

3. *Reimbursement Process*

Like any other provider, an RNHCI must, to receive reimbursements for Medicare-eligible services, prepare and submit a "cost report[]" at the end of its fiscal year. See 42 C.F.R. § 413.20(b). The reports detail the costs incurred by the provider and what portions are reimbursable under Medicare. See, e.g., Athens Cmty. Hosp., Inc. v. Schweiker, 743 F.2d 1, 3 & n.1 (D.C. Cir. 1984). The report is not submitted directly to the government, but instead to a "fiscal intermediary" – typically a "private insurance company acting as an agent for the [government]" that audits providers' cost reports and determines their Medicare reimbursements. Bethesda Hosp. Ass'n v. Bowen, 485 U.S. 399, 400-01 (1988). A provider dissatisfied with the intermediary's decision may appeal to the Provider Reimbursement Review Board (PRRB) – an independent body housed within CMS – which may "affirm, modify, or reverse intermediary decisions." Id. at 401. The Administrator for CMS may then "review the matter further," issuing a final decision that the provider, if it remains dissatisfied, may seek review of in district court. Id. (citing 42 U.S.C. §§ 1395oo (a), (d), (f)).

B. Factual and Procedural History

This case was brought by four different Plaintiffs, all of which are Medicare-certified RNHCI providers that operate Christian Science Nursing Arts Training Programs, and all of which were denied pass-through reimbursement for those programs during 2002-2006. See A.R.II at 2-3 & n.1 (Second CMS Decision). Because the parties agreed at the outset of the four administrative appeals that the issues were identical among all Plaintiffs, the parties consolidated

the cases and selected Chestnut Hill as lead Plaintiff.  See A.R.I at 2 n.1 (First CMS Decision).

The Court's facts are thus taken from Chestnut Hill's administrative record.

Chestnut Hill is a Medicare-certified RNHCI operating in Chestnut Hill, Massachusetts,

that runs a Christian Science Nursing Arts Training Program.  See A.R.I 64 (First PRRB

Decision).  Before 1997, its facilities and nurse-training program were overseen by the Mother

Church, which accredited both using a certain set of standards not relevant here.  See A.R.I 271

(Testimony of Michael Schierloh) at Tr. 141:23-144:23.  In 1997, however, the Mother Church

spun off its accrediting activities to a separate non-profit organization called the Commission for

Accreditation of Christian Science Nursing Organizations/Facilities, Inc. ("The Commission").

See id.; see also id. at A.R.I. 270, Tr. 139:3-7.  The Commission did not simply adopt the

standards previously used by the Mother Church, but instead wrote its own new set of standards.

See id. at A.R.I 271, Tr. 144:16-23.  At all times during the years in question, the parties agree

that the Commission "accredited" Chestnut Hill, meaning that the Commission issued it

certificates of accreditation confirming it had met the Commission's standards.

In 2007, a fiscal intermediary denied pass-through treatment for Chestnut-Hill's nurse-

training program for fiscal years 2002-2006 because the intermediary concluded that: (1) the

Commission was not the nationally recognized accrediting body for evaluating the "particular

activity" of Christian Science nurse-training schools, and (2) because the Commission lacked

specific standards, it did not "accredit" Chestnut Hill's program.  See First PRRB Decision at

A.R.I 65-66.

Plaintiff then sought review before the PRRB, which reversed the intermediary's

decision, concluding that the Commission did have standards and that it was the nationally

recognized body for accrediting Christian Science nurse-training programs.  See id. at 68.  CMS

then reviewed the matter further, reversing the PRRB and agreeing with the intermediary's initial take.  See First CMS Decision at A.R.I 12-16, 18.  It also concluded that the intermediary was correct for the independent reason that Plaintiff's training program "do[es] not lead to the ability to practice and begin employment in a nursing or allied health specialty," 42 C.F.R. § 413.85(h)(3), and thus is ineligible for reasonable-cost reimbursement.  See First CMS Decision at A.R.I 18.

The four Plaintiffs then sought review in this Court, which remanded the case because the PRRB had never addressed the second issue.  See Chestnut Hill Benevolent Assoc. v. Sebelius, No. 10-1206, ECF No. 24 (Oct. 12, 2011) at 2-3.  The Court instructed the PRRB to limit its inquiry on remand to only that issue.  Id. at 3.

On remand, the PRRB again decided in Chestnut Hill's favor.  It acknowledged that an aspiring Christian Science nurse, generally speaking, does not need to take one of the providers' nurse-training programs as a prerequisite to becoming a "Christian Science nurse," but it adopted Chestnut Hill's argument that completing the program is a prerequisite for someone who aims to serve in the purportedly more demanding position of a "staff nurse" in a Medicare-certified RNHCI.  See A.R.II at 60-61 (Second PRRB Decision).  Because the PRRB found that "an individual must complete [one of the providers'] nurse training program[s] . . . in order to be hired as a Christian Science staff nurse in the Medicare-certified wing of a[n] RNHCI," it concluded that Chestnut Hill's training program was eligible for reasonable-cost reimbursement. Id. at A.R.II 60.  Yet again, however, the Administrator reversed the PRRB, disputing that the industry norm among Christian Science RNHCIs "require[d] that staff have completed the subject nursing programs" as a precondition of employment.  See Second CMS Decision at A.R.II 29.

The four Plaintiffs then filed suit again in this Court, seeking judicial review of both of the Administrator's adverse decisions under 42 U.S.C. § 1395oo(f)(1).  See Compl., ¶¶ 14, 90-97.  The parties have filed Cross-Motions for Summary Judgment, which are now ripe for review.

## II.     Standard of Review

Although styled as Motions for Summary Judgment, the pleadings in this case more accurately seek the Court's review of an administrative decision.  The standard set forth in Federal Rule of Civil Procedure 56(c), therefore, does not apply because of the limited role of a court in reviewing the administrative record.  See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006) (citing National Wilderness Inst. v. U.S. Army Corps of Eng'rs, 2005 WL 691775, at *7 (D.D.C. Mar. 23, 2005); Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995), amended on other grounds, 967 F. Supp. 6 (D.D.C. 1997)).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  Sierra Club, 459 F. Supp. 2d. at 90 (quotation marks and citation omitted).  Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the Administrative Procedure Act's standard of review.  See Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), cited in Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).

Judicial review of the Administrator's decisions in this case is governed by the Medicare statute, 42 U.S.C. § 1395oo(f)(1), which incorporates the judicial-review provisions of the APA, 5 U.S.C. § 706.  The Court, accordingly, must "hold unlawful and set aside" CMS's decision only if it is "unsupported by substantial evidence," or if it is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Under this "narrow"

standard of review, "a court is not to substitute its judgment for that of the agency." Motor

Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Rather, the Court "will defer to the [agency's] interpretation of what [a statute] requires so long

as it is 'rational and supported by the record.'" Oceana, Inc. v. Locke, 670 F.3d 1238, 1240

(D.C. Cir. 2011) (quoting C & W Fishing Co. v. Fox, 931 F.2d 1556, 1562 (D.C. Cir. 1994)).

      An agency is required to "examine the relevant data and articulate a satisfactory

explanation for its action." State Farm, 463 U.S. at 43. For that reason, courts "'do not defer to

the agency's conclusory or unsupported suppositions,'" United Techs. Corp. v. U.S. Dep't of

Def., 601 F.3d 557, 563 (D.C. Cir. 2010) (quoting McDonnell Douglas Corp. v. U.S. Dep't of

the Air Force, 375 F.3d 1182, 1187 (D.C. Cir. 2004)), and "agency 'litigating positions' are not

entitled to deference when they are merely [agency] counsel's '*post hoc* rationalizations' for

agency action, advanced for the first time in the reviewing court." Martin v. Occupational Safety

& Health Review Comm'n, 499 U.S. 144, 156 (1991). The reviewing court thus "may not

supply a reasoned basis for the agency's action that the agency itself has not given." Bowman

Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974) (internal

citation omitted). Nevertheless, a decision that is not fully explained may be upheld "if the

agency's path may reasonably be discerned." Id. at 286.

      An agency's interpretation of its own regulation is entitled to "'substantial deference.'"

St. Luke's Hosp. v. Sebelius, 611 F.3d 900, 904 (D.C. Cir. 2010) (quoting Thomas Jefferson

Univ. v. Shalala, 512 U.S. 504, 512 (1994)), especially when the regulation at issue "concerns a

complex and highly technical regulatory program" like Medicare, "in which the identification

and classification of relevant criteria necessarily require significant expertise and entail the

exercise of judgment grounded in policy concerns." Thomas Jefferson Univ., 512 U.S. at 512

(quotation marks and citation omitted).  The agency's construction, therefore, will control, unless

it is "'plainly erroneous or inconsistent with the regulation.'"  St. Luke's Hosp., 611 F.3d at 904-

05 (quoting Thomas Jefferson Univ., 512 U.S. at 512).  In other words, a court may find an

agency interpretation unlawful if "an 'alternative reading is compelled by the regulation's plain

language or by other indications of the Secretary's intent at the time of the regulation's

promulgation.'"  Thomas Jefferson Univ., 512 U.S. at 512 (quoting Gardebring v. Jenkins, 485

U.S. 415, 430 (1988)).

Similarly, "[s]ubstantial-evidence review is highly deferential to the agency fact-finder,

requiring only 'such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion.'"  Rossello ex rel. Rossello v. Astrue, 529 F.3d 1181, 1185 (D.C. Cir. 2008)

(quoting Pierce v. Underwood, 487 U.S. 552, 565 (1988)).  "[A]n agency's conclusion 'may be

supported by substantial evidence even though a plausible alternative interpretation of the

evidence would support a contrary view.'"  Koch v. S.E.C., 793 F.3d 147, 156 (D.C. Cir. 2015)

(quoting Robinson v. Nat'l Transp. Safety Bd., 28 F.3d 210, 215 (D.C. Cir. 1994)).  It is thus

"rare" to conclude that an agency's decision is not supported by substantial evidence.  Id.

## III.    Analysis

This case involves two separate questions, each of which presents an independent basis

for affirming the government's decision.  The first is whether CMS correctly determined that

Chestnut Hill was not accredited in accordance with the applicable regulations.  The second is

whether CMS correctly categorized Plaintiffs' nurse-training programs as "continuing

education" – and thus ineligible for reasonable-cost reimbursement – rather than as a necessary

prerequisite for entering the profession.  Because the Court concludes that an affirmative

response is appropriate to the former, it need not proceed to the latter.  In doing so, the Court is aware that this course appears to render unnecessary its previous remand.  But such remand was not wasted time; on the contrary, the issues that were developed, and the litigating position taken by Plaintiffs as a result, have helped inform the Court's ruling on the issue of accreditation.

Before diving into the merits, however, a point of clarification is in order.  In their briefing, the parties frequently muddy the distinctions between arguments focused on the government's interpretive work – *i.e.*, whether it properly construed its regulations – and its application of those regulations to the facts at hand – *i.e.*, whether substantial evidence supports the outcome here.  The Court treats the two requirements separately.  As to the first, it concludes that CMS reasonably construed its regulation to mean that a program cannot be "accredited" if the relevant accrediting body lacks standards tailored to the specialty training programs under evaluation.  As to the second, the Court holds that substantial evidence supports CMS's conclusion that the Christian Science accrediting body (the Commission) lacked such standards and thus could not be "the recognized national professional organization for the particular activity."  42 C.F.R. § 413.85(e).

A.  Construction of Regulations

Under CMS rules, only "approved educational activit[ies]" may be reimbursed under reasonable-cost principles and thus avoid the cost limits.  See 42 C.F.R. § 413.85(d)(1).  Those rules further specify that, with regard to "nursing . . . education programs[,]" CMS will consider such program "an approved nursing . . . education program if the program is a planned program of study that is licensed by State law, or if licensing is not required, is accredited by the recognized national professional organization for the particular activity."  Id. § 413.85(e) (emphasis added).

13

The underscored clause in § 413.85(e) comprises two separate requirements: (1) that the program be accredited (2) by "the recognized national professional organization for the particular activity." The parties primarily dispute the content of the first. Plaintiffs insist that, as long as the nationally recognized body for Christian Science nursing asserts that it accredited their programs, regardless of what the accreditation process looks like, that is sufficient for pass-through reimbursement. The government, conversely, maintains that accreditation by "the recognized national professional organization" is merely a necessary, but not sufficient, condition for receiving pass-through reimbursement. More specifically, it asserts, "accreditation" obliges the provider to show that the accrediting body has satisfied at least a nominal set of requirements – namely, that it both possesses minimally adequate standards for performing its accreditation function and that those standards are customized to the medical (or nonmedical) specialty in question. The Court separately considers these two requirements.

### 1. *Necessity of Standards*

An obvious starting point is to ask whether CMS reasonably interpreted its regulation to implicitly require that, for a training program to be accredited, the accrediting body must have had at least <u>some</u> standards for conducting an evaluation. Plaintiffs correctly point out that the word "standards" is nowhere to be found in 42 C.F.R. § 413.85(e) and thus advance the uncompromising position that the provision simply "does not require the accrediting body to have particular accreditation standards" at all. <u>See</u> Pl. Reply at 19. Reading the clause to require "standards," they continue, violates what they claim is settled administrative-law doctrine: an agency cannot "impose requirements beyond those specified in the regulation." <u>Id.</u>

As a preliminary matter, Plaintiffs' doctrinal approach is unsupported by the caselaw. Of the seven cases highlighted by Chestnut Hill, four of them – <u>United States v. 4,432 Mastercases</u>

14

of Cigarettes, More Or Less, 448 F.3d 1168 (9th Cir. 2006); Frazier v. Fairhaven Sch. Comm.,

276 F.3d 52 (1st Cir. 2002); Longview Fibre Co. v. Rasmussen, 980 F.2d 1307 (9th Cir. 1992);

and City of Hartford v. Hills, 408 F. Supp. 879 (D. Conn. 1975) – simply do not address the

question of whether an agency may interpret its own regulations to impose requirements that are

implicit in, but not explicitly stated by, the text of the regulation itself.  The first three all touch

on questions of statutory interpretation, including regulatory adherence to clear statutory

prescriptions.  But because it is settled that "Congress did not define 'approved educational

activities,' leaving the definition of that term to the Secretary," Cmty. Care Found. v. Thompson,

318 F.3d 219, 225 (D.C. Cir. 2003), these cases are of little help here.  And City of Hartford has

no apparent relevance at all.

The remaining three cases – Mercy Catholic Med. Ctr. v. Thompson, 380 F.3d 142 (3d

Cir. 2004); Ashtabula Cnty. Med. Ctr. v. Thompson, 352 F.3d 1090 (6th Cir. 2003); and Univ. of

Cincinnati v. Bowen, 875 F.2d 1207 (6th Cir. 1989) – come closer, but ultimately prove

inapplicable.  In Mercy Catholic, the court rejected CMS's reading of a regulation where it was

clear that it "directly" and explicitly "contradict[ed] the plain language" of that rule.  See 380

F.3d at 153.  In Ashtabula County, the Sixth Circuit rejected CMS's narrow definition of the

term "provider," concluding that the word's "meaning is made clear by referencing related

statutes," which defined it in a way that was clearly contradictory to the Secteratry's

construction.  See 352 F.3d at 1096-97.  And, finally, in University of Cincinnati, the court

concluded that CMS had inappropriately imported reimbursement restrictions from a general rule

into a narrower and more specific one, where the general rule explicitly stated that it was

"subject to" – i.e., supplanted by – narrower rules where they existed.  See 875 F.2d at 1209-11.

In short, all three were cases in which the government's construction of a regulation was

"'plainly erroneous or inconsistent with the regulation.'"   St. Lukes Hosp., 611 F.3d at 904-05 (quoting Thomas Jefferson Univ., 512 U.S. at 512).

The interpretation of § 413.85(e) advanced by the Secretary here, however, presents no similar conflict – whether with the plain language of the instant provision or with any other regulation that might bear on the question.  On the contrary, the notion of "standards" inheres in the ordinary meaning of accreditation.  See, e.g., Black's Law Dictionary 23 (9th ed. 2009) (defining "accredit" as "recogniz[ing] (a school) as having sufficient academic standards to qualify graduates for higher education or for professional practice"); American Heritage Dictionary 11 (5th Ed. 2011) ("To certify as meeting prescribed standards or requirements, as of a profession[.]").  And the Secretary's references to "accrediting standards," "accrediting requirements," and "minimum standard of accreditation" throughout the 2001 proposed rulemaking and 2003 final rule reinforces the conclusion that "standards" are implicit in the notion of accreditation.  See 66 Fed. Reg. 3358, 3363, 3365 (Jan. 12, 2001); 68 Fed. Reg. 45346, 45429-33 (Aug. 1, 2003) (discussing numerous ways in which hospitals design or modify their training programs "to meet accreditation standards," "accrediting standards," "educational standards," "educational . . . criteria," and "accreditation requirements").

Nor, for that matter, have Plaintiffs identified any other regulatory provision suggesting that CMS may not reject the purported accreditation of a program if the pertinent accrediting body uses insufficient standards.  This absence comes as no surprise, given that the purpose of relying on an accrediting body is to "ensure that the programs [CMS] pay[s] for under Medicare meet at least a minimum standard of accreditation." 66 Fed. Reg. at 3365.   Indeed, "[a]n accrediting agency is a proxy for the federal department whose spigot it opens and closes," Chi. Sch. of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Sch. & Colleges, 44

F.3d 447, 449 (7th Cir. 1994), and it is thus sensible for the government to confirm that the

accreditation process it relies on is capable of ensuring at least a minimum threshold of quality

from its accreditees.  Under the hardline position taken by Plaintiffs, however, the regulation

"only requires the accrediting body to be recognized by the industry" – and nothing more.  See

Pl. Reply at 19; id. at 21 ("[T]he regulation requires no more than industry recognition.").  By

that logic, CMS would be beholden to whatever "the industry" believes should suffice as

accreditation, even if it is no more involved than a rubber stamp.  The language of the rule does

not command such an absurd result, which stands at odds with the Secretary's clear intent in

using third-party accreditation as a meaningful replacement for its own substantive inquiry.  See

66 Fed. Reg. at 3365.

      Two separate regulatory provisions reinforce this point.  First, obtaining accreditation by

a "recognized national professional organization" is merely a necessary, but not sufficient,

condition for qualifying as an "approved educational activity," 42 C.F.R. § 413.85(e), as the

regulation also requires that the program in question "[e]nhance the quality of health care at the

provider."  Id. § 413.85(d)(1)(i)(C); see St. John's Hickey Mem'l Hosp., Inc. v. Califano, 599

F.2d 803, 810 (7th Cir. 1979) (agreeing with PRRB that a provider adequately demonstrated that

its nurse-training program "contributed . . . to the quality of patient care because [the provider's]

high nursing turnover rate and dearth of nurses were minimized as a result of [its] program").  If

a provider's education program were not evaluated by an entity possessing meaningful standards

of quality, it is unclear on what basis CMS should determine whether the program contributed in

any way to that provider's quality of care.  Cf. Fischer v. United States, 529 U.S. 667, 680

(2000) (noting that health-care providers "must satisfy a series of qualification and accreditation

requirements, standards aimed in part at ensuring the provision of a <u>certain quality of care</u>")
(emphasis added).

Second, as Plaintiffs acknowledge, Medicare will only reimburse an RNHCI for its
inpatient costs if it uses <u>skilled</u> nurses.  <u>See</u> Pl. Mot. at 28; 42 C.F.R. § 403.720(a)(4) (stating that
RNHCI must use "nonmedical nursing personnel who are experienced in caring for the physical
needs of nonmedical patients"); <u>id.</u> § 403.702 (defining "religious nonmedical nursing
personnel" as "individuals who are grounded in the religious beliefs of the RNHCI, trained and
experienced in the principles of nonmedical care, and <u>formally recognized as competent</u> in the
administration of care within their religious nonmedical health care group") (emphasis added).
But it would seem difficult, if not impossible, for CMS to verify that a provider is relying on
"skilled" nurses if the accrediting body that oversees the schools graduating such nurses has no
standards to speak of – let alone standards to evaluate whether an individual is specifically
"competent in the administration of care."  <u>Id.</u>

For these reasons, and in light of the "broad deference" that should be given to the
Secretary when interpreting Medicare's "complex and highly technical regulatory program,"
<u>Thomas Jefferson Univ.</u>, 512 U.S. at 512, the Court concludes that CMS reasonably interpreted
§ 413.85(e) to require the accrediting body to have specific accreditation "standards."

2.  *Content of Standards*

That the accrediting body must have standards only partially answers the question here,
however.  The Court must next decide what characteristics CMS may require these standards to
evince based on a fair interpretation of the regulations.  It concludes that two characteristics may

be reasonably inferred: (1) the standards must meet at least a minimum threshold of substantive

adequacy; and (2) the standards must be tailored to the specialty in question.

*i.* Minimal Adequacy

The government first argues that the standards, to have any meaning at all, must meet a

minimum threshold of adequacy.  In considering this position, it is helpful to begin with the

language of the rule itself.  Immediately following the accreditation requirement, 42 C.F.R.

§ 413.85(e) offers an illustrative list of "[s]uch national accrediting bodies," which "include, but

are not limited to the Commission on Accreditation of Allied Health Education Programs, the

National League of Nursing Accrediting Commission, the Association for Clinical Pastoral

Education Inc., and the American Dietetic Association."  Id.  According to CMS, these examples

were chosen because all of the bodies listed share the same feature: all have been determined by

CMS to meet at least minimum standards of accreditation.  See Gov't Mot. at 27.  As a result,

organizations that fail to meet such minimum standards cannot properly be considered

"accrediting bodies" and thus cannot "accredit" any educational program at all.

Although not identified by name, the government's argument takes the form of *ejusdem*

*generis* – the principle that "where specific words precede or follow general words in an

enumeration describing a particular subject, the general words are construed to embrace only

objects similar in nature to those objects enumerated by the specific words."  Trinity Servs., Inc.

v. Marshall, 593 F.2d 1250, 1258 (D.C. Cir. 1978).  It serves as "an aid to construction" where

there is some ambiguity as to the meaning of a particular statutory or regulatory clause.  See

United States v. Turkette, 452 U.S. 576, 581 (1981).  Such is the case here, where the

interpretation of "national accrediting bodies" advanced by the Secretary is not explicit from the

face of the rule.  See White Mem'l Med. Ctr. v. Schweiker, 640 F.2d 1126, 1129 (9th Cir. 1981)

(relying on *ejusdem generis* in agreeing with HHS Secretary that "intermediate care units" were

19

not "special care inpatient hospital units" under Medicare regulations, where regulation stated

that "such [special care] units (shall) <u>include, but are not limited to</u> burn, coronary care,

pulmonary care, trauma, and intensive care units") (emphasis added); <u>St. Elizabeth's Hosp. of

Boston v. Sec'y of Health & Human Servs.</u>, 746 F.2d 918, 919 (1st Cir. 1984) (same); <u>accord

Post v. St. Paul Travelers Ins. Co.</u>, 691 F.3d 500, 520 (3d Cir. 2012) ("[I]t is widely accepted that

general expressions such as 'including, but not limited to' that precede a specific list of included

items should not be construed in their widest context, but apply only to persons or things of the

same general kind or class as those specifically mentioned in the list of examples.") (quotation

marks and citation omitted); <u>Abubo v. Bank of N.Y. Mellon</u>, 977 F. Supp. 2d 1037, 1046, 1050

& n.11 (D. Haw. 2013) (relying on *ejusdem generis* and principle of *noscitur a sociis* – "a word

is known by the company it keeps," <u>Gustafson v. Alloyd Co.</u>, 513 U.S. 561, 575 (1995) – in

concluding that, where statute stated that "[e]xamples of a bona fide error <u>include, but are not

limited to</u>, clerical, calculation, computer malfunction and programming, and printing errors,"

Congress intended to limit "bona fide errors" to those that were "very minor, technical errors").

    Helpful to the Secretary's *ejusdem generis* argument is that her theory is firmly grounded

in the regulatory history of the current rule, which explains that the illustrative accrediting bodies

were selected for precisely the reason that they meet at least minimum accrediting standards

according to CMS.  In the past – in fact, from 1996 until 2001 – CMS would reimburse an

educational program only if: (1) it produced graduates in an expressly recognized specialty; and

(2) it was accredited by a body approved by CMS as the exclusive body for accrediting such

programs.  <u>See, e.g.</u>, 42 C.F.R. § 405.421(e) (1966) (listing "pharmac[ists]," "physical

therap[ists]," and "nurse anesthetist[s]" as approved specialties); <u>id.</u> § 413.85(e) (2000) (listing

accrediting bodies associated with specific specialties).

In 2001, however, CMS did away with the listing process, opting for the current regime of relying on the nationally recognized approving body for a given specialty.  See 66 Fed. Reg. 3358, 3364-65 (Jan. 12, 2001).  CMS nevertheless decided it would be prudent to keep in the regulation a nonexclusive list of four accrediting bodies as exemplars.  See id. at 3365.  It explained that seven other accrediting bodies were not included, even though "[its] research has shown that [those bodies] also meet at least a minimum standard of accreditation."  Id. (emphasis added).  Their inclusion would have been superfluous, however, because the list was not exhaustive, and because CMS was no longer pre-clearing the list of recognized specialties and approved accrediting bodies.  See id.  The regulatory history supports CMS's position that it can withhold "approval" from an accrediting body whose standards are so patently deficient as to fall beneath "at least a minimum standard of accreditation."  Id.  Undeniably, the rule provides no other criteria directed at the substantive adequacy of the standards, and thus it may not prove a very high hurdle at all.  Nevertheless, as will be discussed below, a second criterion is also implicit in the regulatory structure.

### ii.  Tailored to the Specialty

In addition to minimal adequacy, CMS required that the accrediting standards, rather than being content agnostic, must be tailored to the specific activity under evaluation.  See Gov't Mot. at 26.  This interpretation is a reasonable one.  Once again, the language of the rule guides the way: "CMS will consider an activity" to be "approved" if it is "accredited by the recognized national professional organization for the particular activity."  § 413.85(e) (emphasis added).  Certainly, the phrase "for the particular activity" modifies "national professional organization."  See id.  But the "for the particular activity" requirement would appear to serve no purpose if every specialty could rely on accrediting bodies that use content-neutral standards.  In other words, if the only standards those bodies used were set at such a high level of generality as to be

applicable to any training program, regardless of its content, the nationally recognized body for phlebotomists would be equally qualified to accredit a training program for certified registered nurse anesthetists (CRNAs).  If it is to mean anything, the "for the particular activity" requirement must mean, at a minimum, that the accrediting body has at least <u>some</u> standards that are specific to the category of training programs that it will evaluate.  <u>Accord</u> Schierloh Test. at A.R.I 271, Tr. 142:20-143:19 (explaining that neither the Joint Commission on Accreditation of Healthcare Organizations nor the Department of Education would be qualified to accredit Christian Science nurse-training programs because the "type of care" provided by RNHCIs and taught in their facilities was not "the type of care [those bodies] would normally teach or expect to see rendered to patients").

The rules governing reimbursement of RNHCI inpatient costs, discussed *supra*, also suggest that accrediting standards must be geared towards ensuring that an individual who graduates from an accredited institution has particular competencies <u>in that specialty</u>.  To qualify for reimbursement, an RNHCI's nursing staff must be "trained and experienced <u>in the principles of nonmedical care</u>."  42 C.F.R. § 403.702 (emphasis added).  Given that Plaintiffs view graduates of their programs as automatically satisfying Medicare's "trained and experienced" nurses requirement, <u>see</u> Pl. Mot. at 16, 20, it would seem to follow that Medicare could reasonably require those programs' accrediting body to apply standards specific to the practice of Christian Science nursing.

Other CMS regulations applicable to Medicare Part B reinforce this reading, making clear that the government will not reimburse services provided by certain non-physician specialists unless they are certified by a national accrediting body that has standards <u>specific to that specialty</u>, or have graduated from a school that is accredited by a body with standards

specific to that specialty.  See, e.g., 42 C.F.R. § 410.69(b) (2003) (requiring, as a condition of

reimbursement, that CRNAs "ha[ve] graduated from a nurse anesthesia educational program that

meets the standards of the Council on Accreditation of Nurse Anesthesia Programs" or other

program recognized by the Secretary); id. § 410.75(b)(ii) (2003) (nurse practitioners must be

"certified as a nurse practitioner by a recognized national certifying body that has established

standards for nurse practitioners" or is authorized by the State) (emphasis added); id.

§ 410.76(b)(3) (2003) (same for "clinical nurse specialists"); id. § 410.77(a)(3) (2003) (same for

"nurse-midwives"); id. § 410.74(c)(7) (2003) (a physician's assistant's services may be

reimbursed if she "graduated from a physician assistant educational program that is accredited by

the Commission on Accreditation of Allied Health Education Programs," which publishes and

relies on accrediting standards that are specific to each specialty, see CAAHEP, Standards and

Guidelines, http://www.caahep.org/Content.aspx?ID=30 (last visited November 3, 2015)).  As

these rules make clear, CMS is unwilling to spend taxpayer money on nurses or other specialists

who have not been credentialed by an accrediting process specific to the specialty in question.

The regulatory history of the provision, too, is consistent with CMS's reading, replete as

it is with discussions of accreditation requirements tailored to particular specialties.  For

instance, in discussing hospital-run clinical-pastoral-education (CPE) programs, CMS noted that

the recognized body for CPE has established minimum-coursework requirements.  See 68 Fed.

Reg. 45346, 45424-25 (Aug. 1, 2003) (noting that Association of Clinical Pastoral Education,

Inc. requires "4 units, or 1,600 hours of supervised CPE, as the national minimum amount of

CPE that is required to become a board-certified chaplain"); see also id. at 45428 (noting that the

American Society of Health-System Pharmacists accredits pharmacy-residency programs

specific to a given specialty, including "cardiology, geriatrics, infectious diseases, and

oncology").  In addition, CMS decided it was prudent to list CAAHEP as an exemplary

accrediting body in 42 C.F.R. § 413.85(e) – a body that, as noted *supra*, breaks down its

accreditation standards on a specialty-by-specialty basis.  It should come as no surprise, then,

that CMS would interpret "accreditation" to include the implicit assumption that the accrediting

body's standards are tailored to the specialty in question.  The Court thus concludes that CMS's

interpretation of "accredit" as requiring standards specifically tailored to a given specialty are

reasonable and not inconsistent with the regulation.  See Thomas Jefferson Univ., 512 U.S. at

515 ("The Secretary's interpretation . . . is thus far more consistent with the regulation's

unqualified language than the interpretation advanced by petitioner.  But even if this were not so,

the Secretary's construction is, at the very least, a reasonable one, and we are required to afford it

'controlling weight.'") (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414

(1945)).

     Before moving to the application of these regulations, the Court pauses to note that the

government, in its briefs, also argued that 42 C.F.R. § 413.85(e) implicitly requires the

"recognized national professional organization" to be sufficiently independent from its

accreditees, and that the Commission failed that requirement because it and Plaintiffs are both

"affiliated with the Mother Church."  Gov't Mot. at 32.  As this is far from clear and because the

"independence" requirement is merely an additional basis upon which to affirm CMS's decision,

the Court need not reach the issue.

     B.  Application of Regulations

     Having concluded that the government properly interpreted its regulations to require

accrediting standards and ones applicable to the particular specialty, the Court must now decide

whether substantial evidence supports the Secretary's conclusion here – namely, that because the

Commission's standards fall short of what is required for it to be "the recognized national professional organization for the particular activity," § 413.85(e), Chestnut Hill's nurse-training program was not "accredit[ed]" as required by the rule.  See Gov't Mot. at 26; First CMS Decision at A.R.1 (concluding that the Commission lacks "standards to accredit <u>Christian Science Nurse Training Programs</u>") (emphasis added).

The parties by and large agree on when the Commission evaluated Chestnut Hill's facilities and training programs and what standards it relied on in doing so.  Although both sides spill substantial ink arguing about whether the Commission's single accrediting process in fact accredited the <u>facility</u> as an RNHCI or its <u>training program</u> for Christian Science nurses, these arguments are largely beside the point.  This is because the regulations appear indifferent as to whether an accrediting body may simultaneously accredit a facility and its training program in a single evaluation process, yielding a single certificate.  What matters, according to the regulations as interpreted by CMS, is that the body have minimally adequate standards that are tailored to the <u>specialty</u> in question.  The Court thus keeps its focus exclusively on the content of those standards.

For the years in question here, the Commission inspected Chestnut Hill twice – in 2003 and 2006 – and issued two separate accreditation certificates.  See A.R.1 691-97 (2003 Accreditation Letter); A.R.1 686-90 (2006 Accreditation Letter).  Although the parties dispute precisely what aspects of Chestnut Hill were evaluated, they agree that the Commission, in conducting its evaluation, relied on or applied three different documents.  The first is a set of standards written by the Commission called "Accreditation Standards for Christian Science Nursing Facilities."  See A.R.1 707-20.  The second is a document titled "Checklist for Inspecting Nursing Organizations/Facilities for Christian Scientists," which appears to be a

document used by Commission inspectors in performing their triennial evaluations.  See A.R.I 722-43 (Checklist).  The only relevant portions of these two documents are Commission Standards C-8 and C-9, see A.R.I 717, and Checklist pages 9-10, which provide questions relevant to "facilities that have Nursing Schools/Education programs."  See A.R.I 730-31.  The last document is Manual of the Mother Church, Art. VII, § 31, see A.R.I 1384-85 (Manual By-Law Regarding Christian Science Nurses), which the Checklist incorporates by reference as "the standard for any educational activities" carried out by a Christian Science facility.  See Checklist at A.R.I 730.

The Court need not decide whether these standards, taken together, satisfy the requirement of minimal adequacy because substantial evidence supports CMS's conclusion that none is specifically tailored to the specialty in question.  In deciding what that "specialty" is, the Court relies on Plaintiffs' view, advanced in their briefs, that their programs graduate individuals whose specialty consists of being a Christian Science "staff" nurse in a Medicare-certified RNHCI – a specialty that they claim is wholly distinct from being a non-credentialed, "Journal listed" nurse, who, according to Plaintiffs, is not qualified to work in an RNHCI.  See Pl. Mot. at 10.  In Plaintiffs' view, their training programs do not merely produce Christian Science nurses, but rather graduate specialists in Christian Science staff nursing, who they contend are more highly qualified than other Christian Science nurses and are thus the only nursing personnel eligible to work in Medicare-certified RNHCIs.  See id. at 10 & n.5.  Such staff nurses differ substantially from what are known as Journal-listed Christian Science nurses, who, Plaintiffs claim, are less qualified and lack the credentials necessary to work in an RNHCI.  See id. at 10 n.5 ("[B]eing Journal-listed, standing alone, does not qualify an individual for employment in a Medicare-certified RNHCI."); see also id. at 11.  "Journal listed" refers to the Mother Church's

requirement that, for an individual to hold himself out as a Christian Science nurse, he must be "listed" in the Church's publication called <u>Christian Science Journal</u>.  <u>See</u> <u>id.</u> at 10 n.5.  To obtain such a listing, an applicant must articulate how he practices as a nurse, provide references of three other <u>Journal</u>-listed nurses who have observed and can vouch for the applicant's care (or other alternative persons who can speak to his qualifications), and verify that he is fully prepared to represent himself as a Christian Science nurse.  <u>See</u> Second Administrator Decision, at A.R.II 17.

Moving to the three documents, the Commission's Accreditation Standards – and specifically Standards C-8 and C-9 – are far afield of anything that could be considered an educational standard tailored to any specialty, let alone the specialty of staff nursing in an RNHCI.  The two standards are contained in subsection C, which is titled "Responsibilities of Christian Science Nurses in the Facility."  <u>See</u> Accreditation Standards at A.R.I 716-17. Subsection C generally deals with how a Christian Science facility staffs its workforce and includes certain minimum criteria such as ensuring adequate staff ratios, supervision structures, and documentation.  <u>Id.</u>  Standards C-8 and C-9 are more specific to the qualifications of the workforce itself:

> 8. The organization provides documentation of regular and on-going training or review of the skills and practices necessary to insure proper care is provided to patients.
>
> 9. Facilities engaged in training maintain documentation of on-going instruction, evaluation and on the job training/mentoring/side by side nursing.

<u>Id.</u> at 717. Neither articulates a standard that is particular to training and graduating Christian Science nurses at all.  Rather, the standards are generally applicable to any type of training program that a facility might use to maintain and improve its workforce.  As the former

Executive Director of the Commission admitted to the PRRB, C-8 and C-9 are generic standards

that can apply to any training program that a nursing facility undertakes, including continuing-

education programs or a peer-review programs:

> THE CHAIRMAN: . . .   Don't [Standards C-8 and C-9] apply
> equally to . . . a nursing facility that does not have a nursing school,
> but just has continuing education for its staff or peer review?
>
> MR. SCHIERLOH:   It was designed to include that type of
> education.
>
> THE CHAIRMAN:  Okay.  So even if you didn't have a nursing
> school, [Standards C-8 and C-9] would be applicable and you would
> grade the facility?
>
> MR. SCHIERLOH:  In general."

Schierloh Test. at A.R.I 287, Tr. 205:25-206:17.

The second document – the Checklist – is no more specific than Standards C-8 and C-9.

The standards in the Checklist are as follows:

> Facilities that provide classroom instruction to prepare individuals to
> become Christian[] Science Nurses will be inspected for compliance to
> standards addressing:
>
> The *Manual* By-Law for the Christian Science nurse (Article VIII, Section
> 31) is the standard for any educational activities.
>
> - The application process itself
> - Facility is aware of and follows national laws and regulations regarding
>   foreign nationals, as well as national and local laws pertaining to health,
>   safety, and patient rights.
> - Determines candidates' ability to meet the above as well as their
>   readiness and suitability to pursue Christian Science nursing education
>      Applicants accepted for admission shall be:
>      Members of the Mother Church
>      Practicing Christian Science
>      Convinced of the efficacy of Christian Science
> - Provides proper housing and meals, as well as cultural/language
>   acclimation
> - Has designed a defined program with definite timeframes to complete
>   the entire programs and any partial steps

- Has an established curriculum that is in accord with the Commission standards and all published directives from the Mother Church
- Qualified Instructors
    Instructors:
    Shall be Journal advertisers
    Shall have both field and facility experience
    Shall have substantial experience in the areas they teach
    Shall have teaching schedules that allow sufficient time to carry out their responsibilities.
- There should be appropriate class size, instructor/student ratio
- On-going assessment of students, instructors and the program
- Follow-up mentoring programs
- Measurable standards for evaluation
- Appropriate scheduling
- Students have time for classroom, study, floor practicum as well as personal needs.

A.R.I 730-31.

None of these detailed standards is in any way specific to a training program whose purpose is to produce Christian Science staff nurses "train[ed] to function and be hired as a staff nurse in a Medicare-certified RNHCI." Pl. Mot. at 16-17. Instead, the standards are applicable to any type of nursing-education program, regardless of content. And, like Standards C-8 and C-9, the questions appear equally applicable to multiple forms of training, whether of short or long duration, degree-conferring or not. Indeed, the Commission's express accreditation of Chestnut Hill's visiting-nurse program – a program that is admittedly distinct from its Nursing Arts program – suggests that the standards are equally applicable to both. See 2006 Accreditation Letter at A.R.I. 686; Schierloh Test. at A.R.I 285-87, Tr. 200:18-206:17.

Finally, the third standard – the <u>Manual</u> By-Law Regarding Christian Science Nurses – requires little discussion. The text of the By-Law reads, in full:

> A member of the Mother Church who represents himself or herself as a Christian Science nurse shall be one who has a demonstrable knowledge of Christian Science practice, who thoroughly understands the practical wisdom necessary in a sick room, and who can take proper care of the sick.

> The cards of such persons may be inserted in <u>The Christian Science Journal</u> under rules established by the publishers.

<u>Manual</u> By-Law at A.R.I 1384.  According to Plaintiffs, the <u>Manual</u> By-Law refers to the baseline requirements for an individual who wishes to hold himself out as being a "<u>Journal</u>-listed" nurse.  <u>See</u> Pl. Mot. at 10 n.5  Yet, as Plaintiffs concede, "The record is clear that being Journal-listed, standing alone, does <u>not</u> qualify an individual for employment in a Medicare-certified RNHCI."  <u>Id.</u>  It thus plainly cannot suffice as an accrediting standard for a training program designed to credential a more highly trained and qualified Christian Science staff nurse.

In sum, not one of the three documents relied on by the Commission to accredit Christian Science facilities is tailored to training programs that graduate Christian Science staff nurses.  Substantial evidence thus supports CMS's conclusion that the Commission lacked accrediting standards as required by 42 C.F.R. § 413.85(e) and thus did not "accredit" Chestnut Hill's Nursing Art's program.  Such a decision makes particular sense in the context of nonmedical care, where Congress has, to avoid excessive entanglement with religion, delineated what types of services may be reimbursed and what falls outside the bounds of reimbursable care.  <u>See</u> <u>Children's Healthcare Is a Legal Duty, Inc. v. Min De Parle</u>, 212 F.3d 1084, 1098 (8th Cir. 2000) (concluding that the statutory provision governing payments to RNHCIs "authorizes payment only for 'inpatient hospital services or post-hospital extended care services,' 42 U.S.C. §§ 1395i–5(a), which are defined as bed and board and such other physical care services that are ordinarily furnished by health care facilities," but does not cover "the spiritual healing services that may take place within RNHCIs.").

The Court, consequently, will affirm the Administrator's decision disallowing pass-through treatment for the costs of Plaintiffs' training programs.

**IV.     Conclusion**

For the foregoing reasons, the Court will deny Plaintiffs' Motion for Summary Judgment and grant Defendant's Cross Motion for Summary Judgment.  A separate Order will issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge


Date:   November 3, 2015